Chief Judge KOZINSKI,
dissenting in large part: *
The majority hijacks the Department of Veterans Affairs’s (VA’s) mental health treatment and disability compensation programs and installs a district judge as reluctant commandant-in-chief. That judge must now decide “what procedural protections are necessary” to satisfy the majority’s due process concerns, “enter an appropriate order instructing” the VA to change its procedures and then monitor the VA, perhaps indefinitely. Maj. op. at 878, 887. The majority tramples over the strict jurisdictional limits Congress has imposed on our ability to review the VA’s decisions on veterans’ benefits. See 38 U.S.C. §§ 502, 511. Not content to ignore Congress, the majority also brushes aside the Supreme Court’s admonition that we must accommodate the strong government interest in making the VA’s proceedings “as informal and nonadversarial as possible.” Walters v. Nat’l Ass’n of Radiation Survivors, 473 U.S. 305, 323-24, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985). This is a recipe for endless rounds of litigation over the meaning of “necessary” and “appropriate,” and the procedures the majority orders the district court to consider — imposing deadlines on the VA and requiring another layer of appeals — are the antithesis of an “informal and nonadversarial” system. Today’s decision will undoubtedly distract the VA from its ultimate mission: taking care of veterans who risked their lives for our nation. Because I cannot join in today’s Article III putsch, I dissent.
I
Much as the VA’s failure to meet the needs of veterans with PTSD might shock *891 and outrage us, we may not step in and boss it around. Congress erected a big “keep out” sign for us in the Veterans’ Judicial Review Act (VJRA), which provides that:
The Secretary [of Veterans Affairs] shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans ____ [T]he decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by any court....
38 U.S.C. § 511(a) (emphasis added). The VJRA precludes us from reviewing all decisions “by the Secretary or his delegate,” Bates v. Nicholson, 398 F.3d 1355, 1365 (Fed.Cir.2005), on “all questions of'law and fact necessary to a decision” on veterans benefits, 38 U.S.C. § 511(a) (emphasis added). The statute also covers claims where review of such decisions is a “necessary predicate.” Price v. United States, 228 F.3d 420, 422 (D.C.Cir.2000) (per curiam). Thus, we lack jurisdiction if adjudicating a claim “would require the district court to determine first whether the VA acted properly in handling [the veteran’s] request.” Id.; accord Thomas v. Principi, 394 F.3d 970, 974 (D.C.Cir.2005); see also Broudy v. Mather, 460 F.3d 106, 115 (D.C.Cir.2006).
The exclusive avenue for review of the VA’s decisions is to file an appeal with the Board of Veterans’ Appeals (BVA), a tribunal within the VA. 38 U.S.C. § 7104(a); see Price, 228 F.3d at 421 (VJRA “precludes judicial review in Article III courts of VA decisions affecting the provision of veterans’ benefits”). From the BVA, a veteran may appeal to the Court of Appeals for Veterans Claims (Veterans Court), an independent Article I court, 38 U.S.C. § 7252(a), and then to the Federal Circuit, populated by Article III judges just like us, id. § 7292(c).
Applying the VJRA here should be short work. Plaintiffs claim that the VA’s extensive delays in providing mental health care and disability compensation constitute a deprivation of statutory entitlements under the Fifth Amendment’s Due Process Clause. See 38 U.S.C. § 1710(a)(1) (the VA must “furnish hospital care and medical services” that it “determines to be needed” to “any veteran for a service-connected disability”); id. § 1705(b)(1) (the VA must “ensure that the provision of care to [veterans] is timely and acceptable in quality”); id. § 1110 (veterans are entitled to compensation for “disability resulting from personal injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty”). Mental health care and disability compensation are clearly “benefits.” See 38 C.F.R. § 20.3(e) (defining “benefit” to include “any payment, service ... or status, entitlement to which is determined under laws administered by the Department of Veterans Affairs pertaining to veterans”). Therefore, we lack jurisdiction to review the VA’s decisions as to them. See Thomas, 394 F.3d at 975 (claims that VA “failed to render the appropriate medical care services” and denied “known needed and necessary medical care treatment” are “barred by section 511”); Vietnam Veterans of Am. v. Shinseki, 599 F.3d 654, 656 (D.C.Cir.2010) (recognizing that decisions as to disability compensation fall under the VJRA); Littlejohn v. United States, 321 F.3d 915, 921 (9th Cir.2003) (same). But we can’t decide plaintiffs’ due process claims without “determin[ing] first” whether the VA “acted properly in handing” requests for benefits; thus, we lack jurisdiction over these claims. See Price, 228 F.3d at 422; Thomas, 394 F.3d at 974; Broudy, 460 F.3d at 115. Because we lack jurisdiction, we must dismiss. Cf. Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514-15, 19 L.Ed. 264 (1868).
*892 The majority appears to believe that Congress didn’t mean what it said when it enacted the VJRA, and roves far and wide for reasons to circumvent its limitations on our jurisdiction. See maj. op. at 870-72, 879-84. This is nothing less than a rebellion against Congress’s consistent policy of limiting judicial review of the VA’s affairs. See H.R.Rep. No. 100-963, at 9, 1988 U.S.C.C.A.N. 5782, 5790 (1988) (“[Ojver the years, the Congress has declared its views that there should be no judicial remedy with, respect to claims for veterans benefits, and this policy was honored for nearly 170 years.” (emphasis added)).[1] The majority eviscerates a statute Congress erected to beat back the last major judicial offensive against the VA. See id. at 21-22; Beamon v. Brown, 125 F.3d 965, 971-72 (6th Cir.1997) (discussing history of the VJRA). As President Reagan might have said, “Here we go again.”
A. Systemwide claims: Plaintiffs claim that the VA’s failure to (1) “timely provide medical care to PTSD recipients and claimants” and to (2) “timely resolve [service-connected disability] claims for PTSD” deprives “claimants of their property and liberty without ... due process.” Complaint ¶¶ 254(b), 260. Were an individual veteran to allege that the VA deprived him of these veterans’ benefits, section 511 would preclude us from reviewing his case. See p. 891 supra. Seeking to escape section 511’s jurisdiction-stripping command, plaintiffs disavowed any intention of seeking relief for individual veterans:
The facts herein pertaining to the [veterans and the organizational plaintiffs] are included for the specific purpose[ ] of ... illustrating the Challenged VA Practices, and not for the purpose of obtaining review of decisions by the VA or CAVC. Nothing herein is intended or should be construed as an attempt to obtain review of any decision relating to benefits sought by any veteran ... or to question the validity of any benefits decisions made by the Secretary of the VA.
Complaint ¶ 39 (emphasis added). Plaintiffs went out of their way to represent that “constitutional defects with the VA’s systems, as set forth herein, are ... divorced from the facts of any individual claim,” id. ¶ 12, and that the “nature of the claims alleged herein and of the relief sought does not make the individual participation of each injured member and/or constituent indispensable to proper resolution of the lawsuit,” id. ¶ 38.[2]
*893 Plaintiffs submitted evidence of average delays to the district court. Based on this evidence, the court found that 4.5 percent “of VA facilities ... reported a wait time of 4-8 weeks” to see patients with “symptoms of moderate severity for depression” and 5.5 percent reported similar wait times for PTSD referrals. There were “approximately 84,450 veterans on VHA waiting lists for mental health services.” The court also made findings as to the VA’s average delay in processing a disability claim, concluding that it took “approximately 4.4 years ... for a veteran to adjudicate a [disability compensation] claim all the way to a BVA decision.”[3] The court didn’t find that any individual veteran was actually denied or likely to be denied his statutory entitlement to mental health care or disability compensation.
The majority concludes that “the conduct [plaintiffs] challenge is not a ‘decision’ within the meaning of § 511” because they don’t “challenge the timing of an individual [benefit],” and instead “challenge systemic delays in the benefits adjudication process.” Maj. op. at 872, 880-81. And it expressly relies on the average delays found by the district court: “All told, over 84,000 veterans are on waiting lists for mental health care.” Id. at 876. “To pursue a claim to completion, for example, may take in excess of 4.4 years.... [during which] many veterans perish, after living in want.... We are particularly doubtful ... that any government interest could justify the 573-day average delay for a Regional OfGce[ ] to certify an appeal to the BVA____” Id. at 884-85 (emphasis added).
The majority purports to side with the D.C. Circuit in construing section 511 to permit plaintiffs’ claims, id. at 881-82, but that court in fact heard a case where plaintiffs disavowed precisely the same individual claims and held that it lacked jurisdiction, see Vietnam Veterans of Am., 599 F.3d at 661-62. There, as here, plaintiffs “went out of their way to forswear any individual relief for the [veterans].” Id. at 662. Their complaint stated:
To the extent any of the facts presented herein apply to individuals rather than to veterans as a whole, they are intended for illustrative purposes only. Nothing in this complaint is intended as, nor should it be construed as, an attempt to obtain review of an individual determination by the VA or its appellate system.
Id. at 657-58 (alteration and internal quotation marks omitted). Compare the quoted language from the two complaints: The only difference is that plaintiffs in our case have more explicitly disavowed individual relief. The D.C. Circuit plaintiffs also submitted affidavits alleging average delays in the VA’s benefits appeals. Id. at 657; see id. at 662 (“[T]he asserted illegal action the VA has committed is described as the average length of time it takes at each stage of the claims process.”).
The D.C. Circuit persuasively explained that plaintiffs’ “rather apparent effort to avoid the preclusive bite” of section 511 ended up stripping them of standing. Id. at 661. I reproduce the court’s discussion below, as the D.C. Circuit has said all there is to say about plaintiffs’ attempt to circumvent section 511.
*894 [T]he average processing time does not cause affiants injury; it is only their processing time that is relevant. If, for example, affiants fell at the quick-processing end of a bell-shaped curve, a high average processing time would be irrelevant to them, and to reverse the analysis, a low average would not avoid injury if affiants were at the other end of the curve. In sum, assuming the alleged illegality — that the average processing time at each stage is too long— that “illegality” does not cause the affiants injury. And causation is a necessary element of standing.
If the affiants were suing by themselves — which is how we must analyze the claim — asserting that the average time of processing was too long, it would be apparent that they were presenting a claim not for themselves but for others, indeed, an unidentified group of others. But one can not have standing in federal court by asserting an injury to someone else. It seems the district judge intuited this point by noting the claims were “not monolithic.”
Id. at 662 (citations omitted). Although the quoted paragraphs focus on delays in processing disability compensation appeals, their reasoning extends to delays in providing mental health care. The D.C. Circuit explained that plaintiffs alleging average, non-individual delays are actually “presenting a claim not for themselves but for ... an unidentified group of others.” Id. Such allegations can’t establish standing. Id. Like plaintiffs in the D.C. Circuit, plaintiffs here disavowed all individual injuries to their members — both actual and likely — and relied on evidence of average delays.[4] Thus, like plaintiffs in the D.C. Circuit, they lack standing to pursue their non-individualized claims. The majority’s not just dead wrong; it creates a square circuit split on an issue that requires national uniformity.
B. Alternative forum: The majority compounds its error by holding that a “broad reading of § 511” would “deprive [plaintiffs] of any forum in which to raise their claims” and thus contravene the Supreme Court’s warning about “the constitutional danger of precluding judicial review of constitutional claims.” Maj. op. at 883. The majority claims that the Veterans Court “laek[s] jurisdiction over the type of claims raised by” plaintiffs because: (1) constitutional challenges must be made “in the context of a proper and timely appeal” from a BVA decision, while plaintiffs have challenged delays before the BVA issues a decision; and (2) organizations can’t present claims to the Veterans Court. Id. at 882-83. But the Sixth and D.C. Circuits addressed the exact same issues and concluded that the Veterans Court could adequately adjudicate veterans’ claims that their benefits had been unreasonably delayed. See Beamon, 125 F.3d at 967-70; Vietnam Veterans of Am., 599 F.3d at 659-60 & n. 6.
The Veterans Court “has authority to reach constitutional issues in considering extraordinary writs [of mandamus],” which it may grant “when the claimant has demonstrated that he ... has no adequate *895 alternative means of obtaining the relief sought.” Beamon, 125 F.3d at 969 (emphasis added) (quoting Dacoron v. Brown, 4 Vet.App. 115, 119 (1993)). This “power to issue writs of mandamus compelling VA officials to take action that has been unreasonably delayed” extends to cases where “there has been no final decision by the Board. ” Vietnam Veterans of Am., 599 F.3d at 659 n. 6 (emphasis added) (citing Erspamer v. Deruiinski, 1 Vet.App. 3, 6-9 (1990)). Individual veterans can bring their constitutional claims in the Veterans Court; should the court find a due process violation, it will issue a writ of mandamus ordering appropriate relief. Those veterans denied a writ can appeal their constitutional claim to the Federal Circuit. See Nielson v. Shinseki, 607 F.3d 802, 805 (Fed.Cir.2010) (“[W]e have jurisdiction to review all legal questions decided by the Veterans Court.”). Construing section 511 to preclude plaintiffs from bringing their claims in our court doesn’t foreclose all relief.[5]
Nor should we trouble ourselves that organizational plaintiffs can’t present constitutional claims in the Veterans Court. Congress has broad powers to shape the procedural rules and constitutional remedies available to veterans. See Walters, 473 U.S. at 333-34, 105 S.Ct. 3180; cf. Tietjen v. U.S. Veterans Admin., 884 F.2d 514, 515 (9th Cir.1989) (construing section 511’s predecessor to foreclose all review of claim that VA violated due process by ignoring its own regulations); Anderson v. Veterans Admin., 559 F.2d 935, 936 (5th Cir.1977) (per curiam) (same for claim that hearing procedures violated veteran’s constitutional rights). The majority actually points to Walters, where the Supreme Court recognized these broad powers, when it rejects plaintiffs’ claim that veterans’ constitutional rights were violated by the absence of a class action procedure in the VJRA. Maj op. at 888 (“Underlying all the procedural restrictions cited by [plaintiffs] is what the [Supreme] Court has already held to be the government’s interest in the creation and preservation of a non-adversarial system.”); see complaint ¶ 30. Because plaintiffs brought “this action as the representatives of their members ... and as class representatives,” organizational standing in our case would simply be a tool, like class actions, for vindicating individual members’ interests. Complaint ¶ 38. If the absence of one tool doesn’t render judicial review constitutionally inadequate, then, given the broad powers Congress has to shape veterans’ remedies, the absence of the other shouldn’t either.[6] And the Veterans Court’s holdings are binding on subsequent BVA and Veterans Court adjudications, so a ruling *896 on one veteran’s due process claim will have a systemwide effect. See Beamon, 125 F.3d at 970 (citing Lefkowitz v. Derwinski, 1 Vet.App. 439, 440 (1991) (en banc) (per curiam)).
C. The Price-Thomas Rule: The majority spends pages and pages creating circuit splits, but it never applies the correct test for determining our jurisdiction. Price and Thomas held that we lack jurisdiction if adjudicating a claim “would require the district court to determine first whether the VA acted properly in handling [the veterans’] benefits request[s].” Broudy, 460 F.3d at 115 (emphasis omitted) (quoting Thomas, 394 F.3d at 974 (quoting Price, 228 F.3d at 422)) (internal quotation marks omitted). This is the case for plaintiffs’ mental health care and disability compensation claims, so even if plaintiffs had standing to bring these claims, we would lack jurisdiction over them.
Mental health care: The majority claims that “vast numbers of veterans are denied access to mental health care by administrators,” and that the absence of “an appeals process to challenge appointment scheduling ... violates the Due Process Clause by providing insufficient process.” Maj. op. at 871, 876. The lack of an appeal can’t be unconstitutional unless administrators schedule appointments in a way that actually deprives veterans of their statutory entitlement to mental health care: If there’s no deprivation, there’s no need for process. See Bd. of Regents of State Colls, v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). This will depend on the facts of each veteran’s case: An eight-week wait for an appointment constitutes a deprivation for a veteran who’s pointing a gun at his head, but it may be acceptable for a veteran who’s mildly depressed. And there can be no deprivation if the veteran caused the delay by rejecting earlier available appointments. Thus, there is simply no way to adjudicate the due process claim without “determin[ing] first” whether the VA’s administrative staff “acted properly in handling” veterans’ requests for appointments. Because plaintiffs’ mental health care claim requires consideration of the VA’s decisions on individual requests for benefits, the VJRA precludes us from reviewing it.
The majority brushes aside the VJRA’s limits on our jurisdiction by construing a footnote in the VA’s appellate brief to “acknowledge[] that” plaintiffs’ purportedly systemic claims “fall[ ] outside the VJRA’s jurisdictional bar.” Maj. op. at 870-71. But the VA argued in district court that the VJRA does preclude review of plaintiffs’ mental health care claim. The supposed “acknowledgment” on appeal only pointed out that plaintiffs framed their claims generally. See VA Br. 33 n.7 (“[P]laintiffs cannot now criticize the district court for using a ‘systemic’ standard to assess delay when the generality of their own claims compelled this approach.”). The VA didn’t concede that the district court had jurisdiction over plaintiffs’ mental health care claim, and it’s wrong for a court to wring a concession from a party’s ambiguous language. But it doesn’t matter anyhow, because we have an “independent obligation to ensure that [we] do not exceed the scope of [our] jurisdiction.” Henderson ex rel. Henderson v. Shinseki, — U.S. -, 131 S.Ct. 1197, 1202, 179 L.Ed.2d 159 (2011).
The majority responds by arguing that the VA “has not issued a decision ... that is final and conclusive and unreviewable.” Maj. op. at 871 (emphasis and internal quotation marks omitted). But the VJRA’s prohibition on judicial review isn’t limited to final decisions. It extends to the VA’s resolution of any “question[] of law [or] fact necessary to a decision by the [agency] under a law that affects the provision of benefits.” 38 U.S.C. § 511(a). De *897 cisions by administrative schedulers setting up mental health care appointments for veterans are fully covered by the VJRA’s preclusive reach, and we lack jurisdiction over any claim that would require a district court to review them. See Price, 228 F.3d at 422; Thomas, 394 F.3d at 974; see also Broudy, 460 F.3d at 115.[7]
It makes no difference that Price and Thomas were “tort suit[s] brought by an individual veteran,” while plaintiffs filed “a suit for an injunction.” Maj. op. at 872. Like the claims in Price and Thomas, plaintiffs’ claim is based on an allegation that the VA unjustifiably denied benefits to veterans — here, by taking too long to provide them with mental health care. And when plaintiffs in Broudy requested an injunction, the D.C. Circuit still applied the Price-Thomas rule, although it concluded that the district court had jurisdiction over the particular claim there. 460 F.3d at 110, 115. The majority’s clumsy effort to avoid a conflict with Price and Thomas will not fly.
Disability compensation: The district court concluded that section 511 barred plaintiffs’ disability compensation claim because the issue of “whether a veteran’s [disability] benefit claim adjudication has been substantially delayed will often hinge on specific facts of that veteran’s claim.” This is absolutely correct: The time the VA needs to adjudicate a claim depends on its complexity as well as the amount of evidence the VA needs to generate for the veteran, and PTSD claims are among the most complex and fact-intensive. We can’t say whether a delay is unreasonable without “determining] first” how much time the VA should have taken to process that veteran’s disability compensation claim, and section 511 precludes us from making that determination. See Price, 228 F.3d at 422; Thomas, 394 F.3d at 974; see also Broudy, 460 F.3d at 115.
The majority rejects this conclusion because, supposedly, the VA hasn’t “made a final decision in [plaintiffs’] members’ appeals; that their appeals languish undecided is the very basis for their claim.” Maj. op. at 881. But that’s not right: Plaintiffs claim that most of the VA’s unreasonable delays occur well before the BVA is able to rule on the veterans’ appeals. See id. at 860-61; see also id. at 859 (BVA’s time to issue a ruling represents less than a third of the VA’s average delay in processing an appeal of a ratings decision). The VA’s decisions before the appeal reaches the BVA are also final and nonreviewable, except through the VJRA’s “specialized review process.” Bates, 398 F.3d at 1364; see p. 891 supra. Because we lack jurisdiction to review the decisions creating these alleged delays, we can’t determine whether the time the VA takes to process an appeal is unreasonable.
The majority clearly errs when it claims that “§ 511 does not grant exclusive jurisdiction to any agency or court over a class of legal claims, except challenges to ‘decision[s]’ ... that have actually been made by the Secretary.” Maj. op. at 881 (alteration in original) (emphasis omitted). Price, Thomas and Broudy held that section 511 grants the VA exclusive jurisdiction over any claim the district court can’t decide without “determining] first whether the VA acted properly in handling [the veteran’s] benefits request.” Thomas, 394 *898 F.3d at 974 (quoting Price, 228 F.3d at 422); see also Broudy, 460 F.3d at 115. The very essence of plaintiffs’ delay claim is that the VA so mishandled veterans’ requests for benefits that it deprived them of a protected property interest. See maj. op. at 872-73, 885. We can’t adjudicate this claim without evaluating whether the VA “acted properly” at each step in deciding the benefits requests.
The majority’s citation to Broudy doesn’t help them a bit. Plaintiffs there alleged that the VA’s cover-up of radiation test results denied them access to the courts. Broudy, 460 F.3d at 109-10. They requested the “immediate release of all relevant records and documents,” an injunction prohibiting any further coverup, damages and related relief. Id. The D.C. Circuit held that it had jurisdiction over this denial of access claim, which is again consistent with the Price-Thomas rule. See id. at 115. Plaintiffs weren’t “asking the District Court to decide whether any of the veterans whose claims the Secretary rejected [were] entitled to benefits” or “to revisit any decision made by the Secretary in the course of making benefits determinations.” Id. Because the court didn’t need to determine whether the VA “acted properly in handling [a] benefits request,” the VA didn’t have exclusive jurisdiction. Id. (emphasis and internal quotation mark omitted).
Here, there’s no way to adjudicate plaintiffs’ due process claim without revisiting the VA’s decisionmaking. See p. 896-97 swpra. Broudy recognized that in such situations, the rule set out in Price and Thomas grants the VA exclusive jurisdiction. See 460 F.3d at 115. Rather than supporting the majority’s position, Broudy actually undermines it.
The other case on which the majority relies — Hanlin v. United States, 214 F.3d 1319 (Fed.Cir.2000) — is entirely inapposite. There, an attorney sued the VA for attorney’s fees under a breach of contract theory. Id. at 1320. The Federal Circuit held that it had jurisdiction over his claim, which is fully consistent with the Price-Thomas rule. See id. at 1322. The attorney didn’t challenge anything about the VA’s underlying decision on his client’s request for veterans’ benefits. See id. at 1320-21. And the statute governing attorney’s fees didn’t force him to pursue his claim through the VA’s administrative process: He had the option of suing in district court. Id. at 1321-22; see 38 U.S.C. § 5904(d). Section 511 therefore didn’t “require the Secretary to address [the attorney’s] claim and thus [did] not provide the VA with exclusive jurisdiction.” Hanlin, 214 F.3d at 1321.
Plaintiffs here represent veterans who could file their benefits claims only with the VA. See 38 U.S.C. § 5101(a) (“A specific claim in the form prescribed by the Secretary ... must be filed in order for benefits to be paid or furnished to any individual under the laws administered by the Secretary.”). When they did, the VA was required to address their claims and therefore acquired exclusive jurisdiction. See Hanlin, 214 F.3d at 1321 (“[T]hrough the filing of a claim with the VA[], 38 U.S.C. § 511(a) imposes a duty on the Secretary to decide all questions of fact and law necessary to a decision in that case.”).
II
The majority creates a second conflict with the VJRA by installing a district judge as arbiter of whether the VA’s appeals procedures violate due process. The VA has already considered the process due to veterans[8] and promulgated regulations *899 establishing informal, nonadversarial appeals processes. See Vietnam Veterans of Am., 599 F.3d at 656.[9] But the VJRA precludes review of VA regulations anywhere but in the Federal Circuit. See 38 U.S.C. § 502; Preminger v. Principi, 422 F.3d 815, 821 (9th Cir.2005). The district court can’t review the VA’s procedures without also reviewing its regulations, and it therefore lacks jurisdiction to carry out the majority’s marching orders.
The majority vainly attempts to distinguish section 502 by characterizing plaintiffs’ claims as challenges to “the VA’s actual conduct,” and “not its codified, rules.” Maj. op. at 880 (emphasis omitted); see id. (“[Plaintiffs] challenge ... only the VA’s failure to discharge its duty to veterans in a short enough time to avoid depriving them of their property interest without due process.”). This is a distinction without a difference: Were the district court to order the VA to engage in or cease a certain course of conduct, the VA would have to conform its regulations to the district court’s order. See Nehmer v. U.S. Dep’t of Veterans Affairs, 494 F.3d 846, 860 (9th Cir.2007) (“[T]he VA cannot usurp the power of a district court to construe the provisions of an order it has issued ... simply by issuing a regulation interpreting that order or declining to follow it.”). Had plaintiffs “solely challenged the VA’s non-regulatory failure to act,” the district court and our court might have jurisdiction. See id. at 858. But they didn’t: They challenged conduct that the VA’s existing regulations either permit or *900 require. Their suit is a direct challenge to the regulations themselves and therefore barred by section 502.
Ill
Even if we had jurisdiction, plaintiffs’ due process claims would fail on the merits. The Supreme Court explained in Walters v. National Association of Radiation Survivors that the due process balancing test must accommodate Congress’s strong, centuries-old interest in administering veterans’ benefits in a manner that’s “as informal and nonadversarial as possible.” 473 U.S. at 323, 105 S.Ct. 3180; see id. at 326, 105 S.Ct. 3180 (“[U]nder the Mathews v. Eldrige analysis great weight must be accorded to the Government interest at stake here.”); see also Nat’l Ass’n of Radiation Survivors v. Derwinski, 994 F.2d 583, 588-89 (9th Cir.1992) (concluding that “in passing the [V]JRA Congress reaffirmed the government’s interest”). Installing a judge as overseer of the VA’s appeals procedures will unquestionably harm that interest: Plaintiffs must therefore make “an extraordinarily strong showing of probability of error under the present system ... to warrant a holding that [a VA procedure] denies claimants due process of law.” Walters, 473 U.S. at 326, 105 S.Ct. 3180. Plaintiffs fail to clear this high hurdle.
A. Mental health care: The majority claims that veterans “placed on waiting lists by administrators” are denied their statutory entitlement to timely medical care. Maj. op. at 876. Because “no procedure is in place to ensure that mental health appointments are provided soon enough to be effective,” the “marginal value of ‘additional’ procedural safeguards is extraordinarily high.” Id. at 875. But Dr. Murawsky, a VA Chief Medical Officer, testified about several such existing safeguards; the district court credited this testimony. Because the majority misunderstands this evidence, I summarize those safeguards below.
The VA’s most important safeguard protects any veteran who “shows up at a medical center ... and expresses suicidal intentions.” He will be “evaluated by a nurse and then would be seen in the emergency department by a physician.” Should the veteran come to a VA clinic, he’ll “be shown to a doctor”; if he speaks “to a non-medical personnel, then ... they would refer [the veteran] to a nurse” and “[m]ight bring the [veteran] to the emergency department or to the mental health center” at the clinic. The VA conducts “secret shopper” tests where actors posing as suicidal veterans test clinic compliance with the immediate-treatment policy.
Nor does the veteran need to “walk[] into a VA emergency room or clinic,” as the majority claims. Maj. op. at 875. Dr. Murawsky explained that if a veteran calls up and expresses a need for care:
A number of things could happen. The [veteran] could be referred directly to the [VA’s] suicide hotline, the 800 number that’s set up by the VHA. The individual could be transferred to a nurse or a provider to speak to that individual and determine what is happening at that time____ [I]f it’s nighttime ----[the] call is directed to [a VA] call center, where an RN [registered nurse] will answer the line directly, take a patient’s concern and complaint, and then make a decision on ... calling a provider on call or taking care of the— whatever happens to be the need immediately.
Thus, veterans who can’t make it to a clinic can reach a medical professional at any time.
The majority entirely ignores the VA’s national 24/7 suicide prevention hotline. In its first six months, this hotline received 26,000 calls and referred 2,000 veterans to *901 a Suicide Prevention Coordinator. The VA reported that its hotline received 260,-000 calls and recorded its 10,000th rescue after only three years of operations. Dep’t of Veterans Affairs, FY 2010 Performance and Accountability Report at I-15 [hereinafter “VA Report”].[10] VA’s National Suicide Prevention Coordinator described these callers as:
[P]eople who call us but they’ve already taken pills, or they have a gun in their hands, or they’re standing on a bridge.... These are the calls where we can’t wait. We call emergency services right away.... [T]his one call is their last resort.
Id. The hotline is an effective tool for delivering care to veterans who are unwilling or unable to come to a clinic, or who suffer a crisis before their scheduled appointment.
Veterans who don’t need emergency care are protected by a policy set out in the Feeley Memo requiring that “those individuals who either self request [a mental health appointment] or were consulted for mental health ... have an initial evaluation within 24 hours and ... be seen within 14 days of that initial evaluation.” Dr. Murawsky testified that his facilities met the 24-hour rule “about 60 to 80 percent” of the time and “do very well with the 14 day access component,” with most delays “based on the veteran’s choice: work schedules, family needs.” The majority focuses on the fact that the “VA lacks any method to ensure compliance” with these policies systemwide, maj. op. at 877, but plaintiffs didn’t produce evidence that the VA failed to follow the policy. The evidence in the record showing longer wait times is from May 2007, one month before the Feeley Memo was issued. There is no evidence that most veterans aren’t seen within 24 hours after they initiate a request or consultation.
The majority also seems to think that administrative schedulers control the timing of veterans’ mental health care appointments. See id. at 875 (“¡VJeterans whose delayed care stems from administrative decisions have no right ... to insist that they be evaluated by a medical professional.... ”). Not true. Plaintiffs’lawyer proposed the following hypothetical to Dr. Murawsky:
If a veteran shows up to one of your climes and says, “Well, I’m not feeling too well, I think I need to speak to someone,” and if the person there tells them, “Well, we don’t have any appointments right now, why don’t you come back in six weeks,” what is the veteran to do?
Dr. Murawsky testified:
That wouldn’t happen. As far as I’m aware, I have not heard any incidents of that happening. What you describe is a clerk making a medical decision.... That [veteran] would be referred to a nurse who could triage the patient and make a determination of whether they were medically safe or psychiatrically safe. (Emphasis added.)
Plaintiffs never rebutted this testimony.
The majority gets the order of events backwards: Medical staff see the veteran first, and only then does he speak to an administrative scheduler to set up an appointment within the time determined to be appropriate by the medical professional. As the quoted paragraphs indicate, administrative staff do not turn away veterans who want to speak with medical personnel. None of the “examples” or “stor[ies]” the majority cites come anywhere near prov *902 ing that administrative staff deny needed care to veterans.[11]
Dr. Murawsky testified that because a veteran who shows up at a clinic will have “spoke[n] to a nurse,” he “would have had a medical triage or a decision made.” Should the veteran disagree when the nurse tells him, “ ‘You are ... safe to wait’ for however long it might be, ... then the veteran has the right to appeal that decision” by saying, “I want an earlier appointment.” (Internal quotation marks omitted.) This is essentially the same as saying, “I disagree with the decision that it’s okay for me to wait; I’m not all right.” (Internal quotation marks omitted.)
Veterans don’t even have to file an appeal themselves; they can seek the help of a Patient Advocate, who will champion their cause within the VA. As anyone who’s been to the hospital recently knows, having such an advocate can be invaluable. The VA’s Patient Advocates are either on-site or reachable by phone; they will appeal the nurse or doctor’s decision up the chain of command, and, according to VA policy, senior medical staff must respond “within seven calendar days ... to a patient complaint.” If the veteran disagrees with the response, he can continue to appeal, asking for a third opinion, and the doctor giving that opinion may bring in a non-VA specialist.
Creating additional processes for reviewing administrative scheduling decisions would be pointless. Veterans who require immediate care can walk into a clinic, tell a medical professional how they feel over the phone or call the 24/7 suicide hotline. See p. 900 supra. Veterans who don’t need immediate care and request their first mental health care appointment are protected by the Feeley Memo’s policy that they receive an initial evaluation within twenty-four hours and be seen within fourteen days of that evaluation. See p. 901 supra. And for ongoing care, administrative schedulers set appointments within *903 the time determined to be safe by the medical staff. Contra maj. op. at 875-76. If a medical professional says it’s OK to wait six weeks, it makes no difference whether the appointment scheduler sets up an appointment in two weeks or four.
The majority claims that schedulers routinely set up appointments that deviate from the doctor or nurse’s medical assessment, but the only evidence it cites are a 2005 report on the VA’s progress in implementing several PTSD treatment programs and a 2007 audit of the VA’s general outpatient waiting times. Id. at 876. The 2005 PTSD treatment report didn’t address administrative scheduling and is six years out of date, in any event. The 2007 audit has no data or conclusions on mental health wait times. It “reviewed a nonrandom sample of 700 appointments with ... reported waiting times of 30 days or less” and concluded that schedulers’ incomplete record-keeping and “some ‘gaming ’ of the scheduling process” for electronic waiting lists rendered unreliable the VA-eollected data on waiting times and the number of patients on such waiting lists.[12] This proves at most that large systems involving many participants are subject to occasional glitches; it comes nowhere near proving that administrative schedulers systematically delay veterans’ mental health care treatment beyond the maximum wait time determined by a medical professional.[13]
The VA has rolled out multiple, overlapping safeguards to ensure that veterans receive necessary mental health care. The evidence shows that these safeguards, while not perfect, work reasonably well. Plaintiffs have failed to show that current procedures create an “extraordinarily strong showing of probability of error.” Walters therefore precludes us from finding a due process violation.
B. Disability compensation: The majority is “particularly doubtful” that “any government interest could justify” the average delays in adjudicating veterans’ disability claims. Maj. op. at 885 (emphasis added). But Walters holds that we must accord “considerable leeway to” Congress’s judgment that existing procedures adequately protect veterans against the risk of erroneous deprivation. 473 U.S. at 326, 105 S.Ct. 3180. Congress hasn’t been shy about imposing rules on the VA to address perceived failures in processing disability benefits. See Nehmer, 494 F.3d at 849 (discussing Congress’s enactment of legislation simplifying the claims process for Agent Orange-connected ailments); see also 38 U.S.C. § 1112(b) (former POWs); id. § 1112(c) (radiation); id. §§ 1117-18 (Gulf War veterans’ illnesses). But it imposed no such rules on mental health-related disability benefits, nor did it im *904 pose any statutory deadline on the VA’s processing of appeals.
Congress recently had an opportunity to tighten control over the VA’s administration of mental health disability benefits when it passed the Veterans’ Benefits Act of 2010, Pub.L. No. 111-275, 124 Stat. 2864. But it didn’t: The Act relaxes only the rules for compensating disabilities caused by a Traumatic Brain Injury (TBI). Id. § 601(b), 124 Stat. at 2884. TBI is commonly linked to PTSD and depression; that Congress specifically addressed one but not the other is strong evidence that Congress doesn’t want us to impose our own remedies. See Heckler v. Day, 467 U.S. 104, 111-12, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984).
When Congress has “committed the timing of hearings and reviews to the discretion of the” agency, “courts should be hesitant to require [additional procedures].” Wright v. Califano, 587 F.2d 345, 353 (7th Cir.1978). That’s particularly true where, as here, the delays are systemwide and “the result of a tremendous explosion in the number of claims that have had to be processed.” Id.) see maj. op. at 853. Congress already exercises vigorous oversight of the VA through its ability to hold hearings on the agency’s operations. See Dep’t of Veterans Affairs, VA Testimony before Congressional Committees, http://www.va.gov/oca/testimony/testimony_ index.asp (last visited Mar. 26, 2011) (collecting House and Senate testimony by VA officials). Because Congress is already actively involved in the agency’s affairs, “programmatic improvements” should be made “in the offices of the [VA] or the halls of Congress,” not through litigation. Lujan v. Nat’l Wildlife Fed’n, 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); see also Heckler v. Campbell, 461 U.S. 458, 466-67, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).[14]
The majority’s judicial adventurism is exceedingly troubling because the VA is no ordinary agency: It provides medical care to over 5.8 million patients and pays pension and disability benefits to approximately 4 million people. VA Report at I-24. It employs hundreds of thousands, spends more than $100 billion a year, and has numerous responsibilities above and beyond mental health disability compensation.[15] Id. at I-27. These responsibilities require the VA to make tough decisions on how to allocate its resources. We lack the institutional competence to revisit these decisions and “the many variables involved in the proper ordering of [the agency’s] priorities.” Heckler v. Chaney, 470 U.S. 821, 831-32,105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).
The majority’s instructions on remand illustrate the folly of its due process holding. The district court must “conduct evidentiary hearings in order to determine what procedures would remedy the exist *905 ing due process violations in the [VA’s] claims adjudication process” and “explore what procedural protections are most appropriate to permit the appeals of veterans to be expedited in the most efficient manner.” Maj. op. at 887. But the district court already held a four-day preliminary injunction hearing and a seven-day trial; together, these generated 2280 pages of transcripts. The parties prepared well over a thousand exhibits, and the district court admitted over a hundred of them at trial. I can’t imagine what new evidence there is for the district court to discover or how it will order systemwide changes to the VA’s adjudicative and administrative processes.
The majority dramatically oversteps its authority, tearing huge gaps in the congressional scheme for judicial review of VA actions. It overrules both Congress’s and the VA’s judgment on the amount of process due to veterans seeking benefits. And it rearranges the VA’s organizational chart by appointing a district judge to head the agency. Congress enacted the VJRA to beat back the last judicial power-grab targeted at the VA. Unless corrected, today’s decision will surely prompt Congress to pass a new “VJRA Restoration Act” to rein in the majority.

 I join those portions of the opinion denying plaintiffs’ Administrative Procedure Act claims, rejecting their challenge to the procedures for filing a claim at a Regional Office and affirming the district court’s refusal to compel a response to one of their interrogatories. For the reasons articulated by the district court, I would affirm its refusal to compel production of all suicide incident briefs.

. The majority believes that its interference is justified because “the stakes are so high for so many” and plaintiffs’ claims involve "grave questions of life and death.” Maj. op. at 851 & n.2. But Congress has enacted numerous restrictions on our power to review the VA’s provision of benefits, none of which contain an exception for "grave questions of life and death.” See Act of Mar. 20, 1933, ch. 3, § 5, 48 Stat. 8, 9; Act of Oct. 17, 1940, ch. 893, § 11, 54 Stat. 1193, 1197; Act of Aug. 12, 1970, Pub.L. No. 91-376, § 8, 84 Stat. 787, 790; Veterans’ Judicial Review Act, Pub.L. No. 100-687, § 101, 102 Stat. 4105, 4105-06 (1988) (VJRA); see also World War Veterans’ Act, 1924, ch. 320, § 5, 43 Stat. 607, 608-09. There's no doubt that Congress has the power to divest us of jurisdiction over such cases. See Lockerty v. Phillips, 319 U.S. 182, 187, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943).
In any event, Congress didn’t foreclose judicial review. Veterans can bring their claims to the Veterans Court and from there to the Federal Circuit, whose judges enjoy Article III independence. The majority disparages our Federal Circuit colleagues by presuming that they are unable or unwilling to protect veterans’ fundamental rights.

. The majority thus misreads the complaint when it suggests that plaintiffs "complain of a variety of injuries actually being experienced or likely to be experienced in the near future by their members,” who "would individually have standing.” Maj. op. at 862 n.16.

. The court made the following findings (with emphasis added and acronyms spelled out): “On average, ... it was taking 261 days for [a] Regional Office to mail [a] Statement of the Case to a veteran.” It takes "573 days, on average, for [a] Regional Office to certify an appeal to the BVA.” "On average, it takes the BVA 336 days to issue adecision....” If a veteran requests a hearing, he "will have to wait, on average, 455 days.” The majority cites these averages in its discussion. See maj. op. at 859.

. It makes no difference that this is a "suit for prospective relief.” Maj. op. at 862 n.16. Plaintiffs stated in their complaint that their claims were "divorced from the facts of any individual claim” before the VA, so they can’t sue on behalf of veterans now being injured by the VA's alleged delays. Nor can they sue on behalf of veterans who have received medical care or whose claims have already been processed. See Vietnam Veterans of Am., 599 F.3d at 661 n. 11. And they can’t sue on behalf of veterans who haven't requested benefits from the VA because any injury there would be purely "conjectural or hypothetical.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted).

. Although the Sixth and D.C. Circuits addressed alleged delays in the VA’s processing of disability claims, their analysis applies with equal force to claims that the VA unreasonably delayed needed mental health care. The Veterans Court can hear appeals of any issue raised before the BVA, and the BVA’s governing regulations extend its appellate jurisdiction to “questions of eligibility for ... benefits administered by the Veterans Health Administration,” other than “[m]edical determinations” of the 1ype that "an attending physician” might face. 38 C.F.R. § 20.101(b). Appointment scheduling decisions are not by any means medical determinations, so the BVA — and therefore the Veterans Court— have jurisdiction to review claims that such scheduling decisions violate due process.

. The majority misses the point entirely when it notes that organizational standing doesn't serve “precisely the same purpose” as a class action. Maj. op. at 883 n.35. Walters held that Congress could effectively deny veterans access to counsel without violating due process. 473 U.S. at 320, 326, 105 S.Ct. 3180. The right to counsel is far more important to a litigant seeking to vindicate his rights than the option of bringing his claim through an organization. If Congress has broad enough powers to effectively deny veterans the former, then it can certainly deny them the latter.

. The majority seems to think that the "relevant ‘decision’ here ... is whether the existing safeguards are constitutionally sufficient.” Maj. op. at 872. But that's the essence of plaintiffs’ mental health care claim. The VJRA strips us of jurisdiction over any claim that would require us to review any VA decision on a question of law or fact necessary to the agency’s resolution of a benefits request. See pp. 896 supra. Here, we’d have to review *898 the decisions by VA administrative schedulers setting up mental health care appointments.

. See, e.g., Stressor Determinations for Post-traumatic Stress Disorder, 75 Fed.Reg. 39,843, 39,849 (July 13, 2010) (to be codified at *899 38 C.F.R. pt. 3) (rejecting claim that restriction on using private doctors to rebut VA determinations violates due process); Board of Veterans’ Appeals: Obtaining Evidence and Curing Procedural Defects Without Remanding, 67 Fed.Reg. 3099, 3101 (Jan. 23, 2002) (to be codified at 38 C.F.R. pts. 19 and 20) ("We think this time-tested approach will adequately serve the interests of veterans both in being heard and in receiving a prompt decision on appeal. In sum, we believe we are protecting the important due process rights of all appellants.”); Well-grounded Claims, 64 Fed.Reg. 67,528, 67,528 (Dec. 2, 1999) (to be codified at 38 C.F.R. pt. 3) (recognizing that "grave questions of due process can arise if there is apparent disparate treatment” in the VA's "volunteering of] assistance” to claimants); Compensation for Certain Undiagnosed Illnesses, 60 Fed.Reg. 6660, 6663 (Feb. 3, 1995) (to be codified at 38 C.F.R. pt. 3) ("[Tjhose sections of the regulations also provide for a 60-day predetermination period ... in order to safeguard a veteran's due process rights.”); Appeals Regulations; Rules of Practice, 54 Fed.Reg. 34,334, 34,342 (Aug. 18, 1989) (to be codified at 38 C.F.R. pts. 14, 19 and 20) (explaining that appeal certification “ensure[s] that the appeals development procedures have been adequate, particularly as they affect the [veteran's] due process rights”).

. The VA's regulations, which must be construed to “secure a just and speedy decision in every appeal,” 38 C.F.R. § 20.1, provide far more help to individual veterans than do our circuit’s rules of appellate procedure. A veteran may initiate an appeal by filing a "written communication ... expressing dissatisfaction or disagreement” with the rating decision "and a desire to contest the result.” Id. §§ 20.200, 20.201. The VA "must reexamine the claim and determine whether additional review or development is warranted.” Id. § 19.26(a). The veteran can also ask to have the rating decision reviewed by a more senior VA official. Id. § 3.2600(a). If the VA concludes after initial review that the rating is correct, it must "prepare a Statement of the Case” that "must contain” a summary of the evidence and applicable laws, "with appropriate citations,” and the reason for the denial of benefits. Id. §§ 19.26(d), 19.29. The VA will then send the Statement of the Case to the veteran, who can use it to file a more detailed "Substantive Appeal” of the VA’s decision. Id. §§ 19.30(a), 20.202. The final step before the BVA begins its review is for the Regional Office to certify the veteran’s appeal. Id. § 19.35. Certification “primarily functions as a check list for the [VA] to insure [sic] that all appeal processing procedures have been completed.” Appeals Regulations Rules of Practice, 57 Fed.Reg. 4088, 4091 (Feb. 3, 1992) (to be codified at 38 C.F.R. pts. 14, 19 and 20).

. The VA’s annual report is an official that the Secretary prepares and submits to the President and Congress. VA Report I-1.

. Plaintiffs provided eight redacted declarations by veterans suffering from PTSD or friends and family of veterans who committed suicide. The majority cites two of these, but neither actually states that administrative scheduling staff denied medical care. Contra maj. op. at 876. In one, the veteran went to the emergency room but decided not to check in after "a veteran in the waiting room told me that [it] was full of hardcore drug-addicts.” Veteran 1 Deck ¶ 14. The veteran later fired two VA psychiatrists: the first because she stopped prescribing him a highly addictive sleep aid, and the second because she didn't read the first psychiatrist’s notes. Id. ¶¶ 18-19. The second veteran committed suicide after being denied inpatient treatment at a VA hospital because "there were no beds available”; one "staff member” said "he didn’t have time to see” the veteran that day but he "should call back the next day.” Mother 1 Deck ¶¶ 8-10. The VA’s failure to provide care to the veteran was due to a lack of medical resources, not the actions of an appointment scheduler.
One of the declarants described his care as "helpful” and stated that his VA counselor helped him avoid suicide. Veteran 2 Decl. ¶¶ 10, 13. Three of the other declarants described denials of care by medical staff. Here’s what they said, with emphasis added: "The VA doctors failed to acknowledge ... my brother's behavior and suicidal intent ... and failed to make every effort to treat the cause of his condition.” Sister 1 Deck ¶ 19. "[H]e was prescribed medications and allowed to see a therapist once per month.” Girlfriend 1 Deck ¶ 4. "[T]he Marine Corps doctors would not order an MRI or a CAT Scan, ... and only gave him narcotic pain medications.... ” Brother 1 Deck ¶ 13. One veteran was unhappy with the frequency of his appointments and his care-givers’ qualifications, but he didn't state that a VA administrator denied him more frequent appointments. See Veteran 4 Deck ¶ 10. And the other declarant did fall through the cracks and waited many months for mental health care, but he also didn’t claim that a VA administrative staffer denied a request for an earlier appointment. See Veteran 3 Deck ¶¶ 15-19. In none of these examples did a VA administrative scheduler deny a veteran’s request for mental health care.

. The audit found that, due to differences between the appointment date requested by the nurse or doctor and the actual appointment date shown in the VA's systems, waiting times were overreported in 25 percent of appointments and underreported in 47 percent of them. The VA claimed that most of these differences could "be attributed to patient preference for specific appointment dates that differ from the date recommended by medical providers.” But because schedulers often failed to note in the VA's systems that the veteran had requested a different date, the auditors couldn't verify the VA’s claim. The differences were "unexplained,” maj. op. at 876, only because the VA couldn't produce such notations.

. The majority also quotes a fragment of the introduction to the 2007 audit describing an earlier 2005 audit of outpatient waiting times. See maj. op. at 876-77. That audit has the same flaws as the 2007 audit and is equally unhelpful. See generally Dep't of Veterans Affairs, Office of Inspector General, No. 04-02887-169, Audit of the Veterans Health Administration’s Outpatient Scheduling Procedures (2005).

. This litigation wouldn't be possible without the reports Congress ordered the VA and GAO to produce, such as the 2007 waiting time audit, the 2005 PTSD implementation report and the May 2007 report on mental health waiting times. And Congress can and does subpoena executive agency documents when there’s a concern that the executive branch is hiding important information. See Josh Chafetz, Executive Branch Contempt of Congress, 76 U. Chi. L.Rev. 1083, 1132-43 (2009). It’s the majority that "gets political reality exactly backwards.” Maj. op at 872 n.27.

. The VA in its last fiscal year provided services to 90,000 homeless veterans, paid education benefits to hundreds of thousands of service members, reservists and family members, managed 7 million life insurance policies, paid for vocational rehabilitation for 107,000 people, guaranteed 314,000 housing loans and maintained just over 3 million graves. VA Report at I-3, I-7, I-24.